UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON, KENTUCKY

UNITED STATES OF AMERICA,    ) Lexington Criminal
                             ) Action No. 18-08
        Plaintiff,           )
                             ) At Lexington, Kentucky
-vs-                         )
                             )
JESSE KESSLER,               ) October 19, 2018
                             ) 9:00 a.m.
        Defendant.           )


TRANSCRIPT OF SENTENCING HEARING PROCEEDINGS
BEFORE THE HONORABLE DANNY C. REEVES
UNITED STATES DISTRICT JUDGE


Appearances of Counsel:

On behalf of Plaintiff:      KATHRYN ANDERSON, ESQ.
                             Assistant U.S. Attorney
                             260 West Vine Street
                             Suite 300
                             Lexington, Kentucky  40507

On behalf of Defendant:      THOMAS C. LYONS, ESQ.
                             Thomas C. Lyons Law Offices
                             201 West Short Street
                             Suite 800
                             Lexington, Kentucky  40507

Court Reporter:              PEGGY W. WEBER, RPR
                             P.O. Box 362
                             Lexington, Kentucky  40588
                             (859) 421-0814


Proceedings recorded by mechanical stenography,
transcript produced by computer.

```
 1        (Whereupon, the Sentencing Hearing proceedings
 2   commenced on Wednesday, October 19, 2018, at 9:00 a.m., on
 3   the record in open court, as follows.)
 4              THE COURT:  All right.  Thank you.
 5              Madam Clerk, if you would call the matter
 6   scheduled for 9 o'clock, please.
 7              THE CLERK:  Yes, Your Honor.
 8              Lexington Criminal Action Number 18-08,
 9   United States of America versus Jesse Kessler, called for
10   sentencing.
11              THE COURT:  Thank you.
12              If counsel would state their appearances,
13   please.
14              Ms. Anderson.
15              MS. ANDERSON:  Kate Anderson for the
16   United States.
17              Good morning, Your Honor.
18              THE COURT:  Thank you.  Good morning.
19              Mr. Lyons.
20              MR. LYONS:  Good morning, Your Honor.
21              Thomas Lyons appearing on behalf of Mr. Kessler,
22   who is present in the courtroom and seated to my left.
23              THE COURT:  All right.  Thank you.
24              This matter is scheduled for a sentencing
25   hearing this morning.
```

1           Before we proceed with the hearing, let me first

2  confirm that Mr. Kessler has had the opportunity to review

3  his presentence report and also to discuss his report with

4  counsel to his satisfaction.

5           Is that correct, Mr. Kessler?

6           DEFENDANT KESSLER:  Yes, Your Honor.

7           THE COURT:  Your presentence report will be

8  placed in the record under seal pursuant to Rule 32.  It

9  is available if the parties should need it for any reason.

10  It's not available for the general public to review.

11          There are a number of objections that have been

12  filed regarding the presentence report.  One does affect

13  the guideline calculations, but at this time I will allow

14  the parties to state their positions with respect to any

15  of the listed objections.

16          Mr. Lyons.

17          MR. LYONS:  Your Honor please, most of the

18  objections that we filed were factual matters, and I think

19  they've largely been resolved, at least they're resolved

20  for my purposes today.

21          The objection that does affect the guideline

22  calculation is the objection I wish to be heard on.

23          THE COURT:  Yes, sir.

24          MR. LYONS:  And basically, Your Honor, the

25  argument is that the probation office has assessed a

1   two-level enhancement under 2A6.2(b)(1)(E).  And that

2   enhancement was applied based on quoted pattern of

3   activity.

4           THE COURT:  And there's no -- as I understand,

5   there's no objection to the factual basis of pattern of

6   activity.  The objection is whether this would constitute

7   double counting.  Is that your position?

8           MR. LYONS:  That's correct.  I think I basically

9   conceded in my sentencing memorandum that we concede the

10  factual portions of the discussion, both in the probation

11  office report, as well as the United States's memorandum.

12          So basically the argument is that the conduct

13  here under 2261(A)(2) requires a course of conduct unlike

14  several of the other statutes, several other crimes that

15  are contained within that statute in (A)(1) and some of

16  the following statutes that cover interstate travel for

17  the purpose of making a threat, interstate travel for

18  violation of a protective order.  And the only statute

19  that talks about a pattern of conduct is (A)(2), which is

20  exactly what he pled guilty to.

21          THE COURT:  Well, because the guideline,

22  Section 2A6.2, covers a number of statutes, doesn't the

23  specific offense characteristic allow that activity to be

24  taken into account, and that distinguishes it from these

25  other statutes, 2261 and 2262, that are also covered by

1    the section?

2           MR. LYONS:  I agree generally with that, Judge,

3    but I think the guideline is intended to cover a whole

4    range of conduct.

5           For instance, if a person were to travel in

6    interstate commerce and make a threat, a death threat, to

7    somebody and travel for the purpose of actually carrying

8    out that threat, and let's say the threat never got

9    consummated.

10          But in addition to that, let's suppose they also

11   sent a series of emails or other -- did other activity.

12          So I think that the guidelines are trying to

13   cover a wide range of conduct.  And in instances where

14   there's not an underlying pattern of conduct that's

15   required for the crime itself as an element of the

16   offense, that's my argument.

17          THE COURT:  But some of these other statutory

18   sections that are covered by 2A6.2 do not require pattern

19   of activity.

20          MR. LYONS:  They do not, Your Honor.

21          THE COURT:  And so this specific offense

22   characteristic takes into account that activity in

23   2261(A).  So it distinguishes that particular section from

24   other sections that are also covered by 2A6.2.

25          MR. LYONS:  Yes, I think that -- I think I agree

1  with that, Your Honor.

2          And I recognize that under Battaglia - I'm sure

3  the Court is familiar with it - that double counting is

4  not necessarily impermissible.  It's impermissible when

5  the exact same conduct is being used to both have the

6  offense level, the base offense level, as well as an

7  enhancement.

8          THE COURT:  And usually the Sentencing

9  Commission indicates if there's an issue of double

10  counting in a particular provision of the guidelines

11  affecting a statute, and that's not present here.

12          MR. LYONS:  It is not present here, but I do

13  note that -- and I guess this cuts both with my argument

14  and against my argument in some ways.  There's a specific

15  provision that talks about where the pattern of conduct is

16  excessive, or whatever, you can have a departure above the

17  guideline range.  So I think -- I think what they've tried

18  to do is to give the Court the options to look at the

19  entirety of the conduct under the different range of

20  statutes and give the Court the opportunity to assess that

21  conduct consistent with what the Court believes is an

22  appropriate sentence.

23          THE COURT:  All right.

24          MR. LYONS:  You know, the cases cited by the

25  probation office, U.S. versus Lee, and the cases cited by

1    the United States, United States versus Fiume and some of

2    the other cases, I note are cases that were decided under

3    (A)(1) of the statute, which does not involve a pattern of

4    conduct.  So I think those cases are distinguishable.

5           I could not find, Your Honor, although I looked,

6    a controlling Sixth Circuit case on this specific issue.

7    It's a little bit of a novel issue, I suppose, and I did

8    not find a lot of cases directly on point.

9           But I think the argument is sound.  If the

10   underlying offense requires a series of acts in order to

11   violate the statute, that same series of acts should not

12   be used to enhance the base offense level under Battaglia.

13          That's the essential argument that I make.

14          THE COURT:  Yes, thank you.

15          Ms. Anderson.

16          MS. ANDERSON:  Your Honor has spoken to two of

17   the points that I outlined in our sentencing memo that I

18   believe support the application of the enhancement.

19          One, that the sentencing guidelines, I think

20   quoting another Court, has not been bashful about stating

21   when it is double counting, and here it did not.  In fact,

22   there is the application note that talks about an upward

23   departure based on a severity of the course of conduct.

24          So it's clear that from the application note at

25   least this guideline is intended to punish more severely

1   for more intense or severe conduct.

2          Moreover, the application -- or the base offense

3   level is talking about the general nature of the three

4   crimes encompassed in this guideline, and the specific

5   offense characteristics choose to highlight some of the

6   more egregious aspects of a crime such as this.  And so,

7   therefore, isn't double counting at all.  Even if it is,

8   it would be permissible.

9          Again, that application note suggesting that an

10  upward departure may be appropriate in some of these cases

11  support that it's not impermissible.

12          So for the reasons Your Honor has already

13  outlined and I stated in the sentencing memo, I believe

14  this is not double counting, and the probation office was

15  correct in applying the two-point enhancement.

16          THE COURT:  All right.  Thank you.

17          Well, as indicated through my questions to

18  counsel, I do not believe that this would constitute

19  impermissible double counting under the deadlines.

20          The particular section, Section 2A6.2, is

21  referenced in the appendix to the guideline manual, 2016

22  edition of the guideline manual.

23          And turning to the appendix, you will note

24  that -- let's see, page 588 of the manual, there's three

25  statutory sections that are covered by 2A6.2.  It includes

 1   Title 18, Sections 2261 and 2261(A) and 2262.

 2            And then when we turn to those particular

 3   sections of the statute, or the statutes, we do see that

 4   2261 covers offenses involving interstate domestic

 5   violence.

 6            2261(A), which is the statute in issue here, is

 7   statute on stalking.

 8            And then 2262 is interstate violation of a

 9   protection order.

10            So for those particular statutory provisions we

11   have one base offense level, but then there are a number

12   of specific characteristics that relate to certain

13   activities that would include matters such as the

14   violation of a Court protective order, which would be

15   referenced in 2262 where bodily injury occurs, strangling,

16   suffocation, or attempting to strangle or suffocate a

17   person, threatened use of a dangerous weapon, or in this

18   particular case, which has been applied here, pattern of

19   activity involving stalking, threatening, harassing, or

20   assaulting the same victim.

21            So under those circumstances, that subsection

22   (e) is distinguishable, and it would apply to the

23   situation that is presented in this particular case and

24   would not constitute double counting.  It is properly

25   applied.

1          There's no factual dispute about whether the

2   pattern of activity occurred with regard to this same

3   victim, and there's no dispute about whether the conduct

4   constitutes stalking or harassing.

5          And, therefore, the two-level enhancement is, in

6   this Court's opinion, properly applied, and the objection

7   therefore will be overruled.

8          There are a number of other objections that have

9   been raised, but the defendant's position would not affect

10  the guideline calculation.  And the position is -- his

11  position is set forth in the objections and will be taken

12  into account in determining the appropriate sentence.

13         The Court has received a number of materials.

14  And before I review the guideline calculations, just let

15  me go through those.

16         I have received the United States' response to

17  the objections and its sentencing memorandum.

18         The defendant has also filed a sentencing

19  memorandum and also a motion for a variance.  And I

20  believe that while the motion itself doesn't appear as a

21  separate motion on the docket, it will be considered,

22  motion for a variance, at the appropriate time.

23         Now, that motion includes a number of materials,

24  including a letter from the defendant, as well as several

25  other letters and materials that pertain in part to a

1   Veteran's Court where the defendant has requested that the

2   Court consider a sentence that would include this re-entry

3   Court involvement in Virginia.

4           And I've also considered the defendant's

5   memorandum that we've just been discussing in support of

6   his objections that have been resolved.

7           If there are any other issues the parties would

8   like to call to my attention, of course, you may do so at

9   the appropriate time.

10          I will adopt the findings that are outlined in

11  the presentence report, as well as the guideline

12  calculations.  I will review the guideline calculations

13  with the parties at this time.

14          And calling the parties attention to the

15  presentence report, beginning at paragraph 16, which

16  indicate that the 2016 edition of the guideline manual has

17  been used, there's a base offense level of 18 and

18  two-level enhancement, which we have just discussed, that

19  results in an adjusted offense level of 20.

20          There is a three-level reduction for acceptance

21  of responsibility.

22          Before the Court can apply the third level of

23  acceptance of credit, it does require a motion from the

24  government.

25          Ms. Anderson.

1           MS. ANDERSON:  The United States so moves.

2           THE COURT:  All right.  I will sustain that

3    motion.  That has the effect of reducing the total offense

4    level to a level 17.

5           Mr. Kessler does not have any criminal history

6    points.  That would place him in Criminal History

7    Category I for purposes of calculating the guideline

8    range in the case, the range for imprisonment.

9           That range is a range of 24 to 30 months.  That

10   is set forth in paragraph 59.

11          The range for supervised release is a range of

12   one to three years as reflected in paragraph 62.

13          And the fine range in the case is a range of

14   10,000 to $95,000.  The fine range is outlined in

15   paragraph 68 of the report.

16          And those are the guideline calculations that

17   have been adopted in this matter.

18          Let's see, I believe there are no counts to be

19   dismissed in this case.  Well, I'm sorry.  There are two

20   counts.  There's the 875 count that was in Count 2.

21          MS. ANDERSON:  Yes, Your Honor.  The

22   United States moves to dismiss Count 2.

23          THE COURT:  All right.  That motion will be

24   sustained.  That count will be dismissed effective upon

25   entry of the judgment in the case.

1          Are there any other motions to be taken up?

2          MS. ANDERSON:  I have no motions, Your Honor.

3          THE COURT:  All right.  Thank you.

4          If counsel would come up to sidebar briefly,

5     please.

6        (Whereupon, a SEALED bench conference was had with

7     the Court and counsel, out of hearing of the open court,

8     and is under separate cover, and the transcript will

9     remain SEALED until further orders of the Court, after

10    which the Sentencing Hearing proceedings continued on the

11    record in open court, as follows.)

12          THE COURT:  All right.  Thank you.

13          If there are no other motions to be taken up,

14    we'll proceed with allocution at this time.

15          And, Mr. Lyons, I'll hear from you and also, of

16    course, from Mr. Kessler if he would like to address the

17    Court.

18          MR. LYONS:  I believe he will like to address

19    the Court after I'm done, Judge.

20          THE COURT:  Yes, sir.

21          MR. LYONS:  Your Honor please, as we -- as we

22    know now, the guideline range is 24 to 30 months.  I have

23    made a semi-unusual request of the Court in terms of my

24    motion for a variance.  So let me go through some of the

25    factors here, as well as my motion for variance --

```
 1              THE COURT:  Yes, sir.
 2              MR. LYONS:  -- if the Court will permit me.
 3              First, we just need to talk about the nature of
 4  the offense.  Although there were some technical issues
 5  with the objections, Judge, I want to tell the Court that
 6  we acknowledge the seriousness of this offense.
 7              The conduct occurred between May of 2017 and
 8  February of 2018.  The conduct was persistent harassing.
 9  It was intended to cause emotional distress to EG and her
10  family.  I think Mr. Kessler has acknowledged that in his
11  letter to the Court and has accepted responsibility for
12  that.
13              Not only were there threatening emails sent,
14  there were emails sent threatening harm to EG's new
15  boyfriend.  We acknowledge that as well.  I think the
16  Court will note that a considerable number of the
17  underlying emails and messaging and so forth involved
18  threats of self-harm, which I think is critical to my
19  argument at this point.
20              So we acknowledge the seriousness of the
21  offense, Your Honor.  It's not a one-off situation, and we
22  understand that that defense requires punishment and
23  requires the Court to take the matter seriously.
24              In terms of the history of the defendant, what
25  we have before the Court today is a 35-year-old veteran.
```

1  This is his first brush with the law.  He's never had

2  any previous contact with the Court system.  I know that

3  is somewhat taken into account with the guideline range,

4  but I always think it's important because I think it bears

5  on the nature of the person and the Court's assessment of

6  that person.  So he's never been in any trouble before.

7           He grew up in Pennsylvania with his mother and

8  stepfather.  He had his dad in his life sporadically.

9           I should note that his mother sits there, his

10  cousin, and the husband of Lois Fritz who sent a letter to

11  the Court with regard to the New Freedom Farm there in

12  Virginia.

13           He left home very early.  You know, he started

14  working at 14.  He basically separated himself from his

15  family, 17, 18 years old, and tellingly did not have any

16  contact with his family.  So there indicates to me that

17  there's some underlying issues there with regard to issues

18  that he may have had as he was -- as he was growing up.

19           He moved, got out of town from where he was, and

20  then he joined the military.  In the military he joined in

21  2005.  The Court knows that at this point that he is

22  United States Marine veteran, served two tours in Iraq in

23  2007 and 2008.  I certainly think that that's a positive

24  aspect to his history.

25           And while I do not have any strong evidence of

1   post-traumatic stress disorder that was suffered simply as

2   a result of the military service, I do think that plays

3   into some of the underlying problems that he's had through

4   the course -- through the course of his life.

5           He obviously has very strong family support.

6           When he exited the military, he did what all

7   good folks do.  He got a job.  He had some very serious

8   technical skills that he learned in the military, and he

9   was more or less continuously employed.  I know there were

10  some times when he was not having -- was not doing so

11  well, at least emotionally.

12          He met EG online.  He does not have much

13  history, Judge, of having dating relationships and having

14  some savvy with respect to those relationships.  And it

15  appears that he invested all his hope in this

16  relationship.

17          As you know, the relationship was terminated by

18  EG.  She made it very clear to him that she did not want

19  to be with him anymore.  That was not equivocal in any

20  way, shape, or form.  He was also warned that his behavior

21  should stop, and it failed to stop.

22          So, I guess, the point I want to make about that

23  is although the pervasiveness of the conduct relates not

24  just to the seriousness of the offense, it also indicates

25  to me some very serious underlying mental health issues.

1             We also have this complicating factor of

2    alcohol.  He was drinking excessively.  He worked odd --

3    an odd shift there during the course of the offense

4    conduct and would often send these emails under the

5    influence of alcohol.  That's not to excuse the conduct.

6    That's to indicate to the Court that he does have a

7    demonstrated substance abuse problem.

8             He was honorably discharged, and so he stands

9    before the Court today.

10            What I have proposed to the Court is fairly

11   straightforward.  I did not have much familiarity with the

12   Federal Veteran's Treatment Court, Your Honor.  I got

13   calls from Ms. Fritz and his cousin, Ms. Kessler, that

14   informed me of this.  I just -- we don't have it here so I

15   did not have a lot of familiarity with it.

16            They were very strongly advocating to me to

17   advocate to this Court that this is a program that would

18   benefit him, that it has all of the treatment options that

19   would help him in terms of reintegrating back into society

20   and treating some of these underlying anger and PTSD and

21   substance abuse issues.

22            I think you have a letter from Ms. Fritz, New

23   Freedom Farm.  That's apparently a nonprofit, and she's a

24   former Navy veteran and helps veterans and has some

25   connection with the treatment Court.

 1              I also spoke with Sami Cilek.  Sami is with the

 2  United States Probation Office in the Western District of

 3  Virginia.  I think she has written a letter to the Court

 4  making it clear that she's familiar with the case;

 5  although, they seem to be a little bit unclear about the

 6  scope of the conduct here.  I think I should recognize

 7  that to the Court.  They talk about a cyber threat, and

 8  that doesn't really capture the nature of the offense

 9  here.  But they -- she does indicate that they will accept

10  him into this program.

11              THE COURT:  How can they do that?  Because

12  that's a veteran's Court program that's a re-entry

13  program.  It occurs prior to the person being adjudicated

14  guilty of a particular charge.

15              MR. LYONS:  Yes, one of my precise questions to

16  them.

17              And the other question was would they take

18  somebody with a felony offense rather than a misdemeanor,

19  which is what the materials talk about.

20              The way I understand this is, I don't know that

21  he would be a traditional enrollee in this program.  I

22  believe if the Court were to believe my proposal had

23  sense -- made sense, then he would be sentenced to

24  16 months, eight months of which he's already served here,

25  and then the Court would put him on eight months of home

1  confinement or community confinement in the district, the

2  Western District of Virginia.

3         Ms. Fritz has indicated that he can stay at the

4  farm under conditions of home incarceration or any other

5  restrictive conditions that the Court deems appropriate.

6         I think Ms. Cilek has already agreed to take

7  responsibility for his supervised release.  It's not that

8  unusual for us to transfer supervised release when

9  someone moves.  So that, I think, is technically he would

10  be under the supervision of the probation office in the

11  Western District of Virginia, and then he would be able,

12  according to her, to have access to these services,

13  including services through the VA in Salem, Virginia.

14         Clearly, he needs these services in my opinion.

15  Whether or not he would actually be monitored by the

16  Federal Judge or Magistrate Judge, I'm not sure which,

17  Judge Bolou who overseas the Court.  I'm not sure exactly

18  how that would work, Your Honor, but it seems to me that

19  any non-compliance with any condition that the Court

20  imposed upon him for failure to follow through with

21  treatment or any other infraction of the rules of that

22  program, would be reported to the Court there and would be

23  reported to Your Honor for purposes of dealing with the

24  supervised release violation.

25         THE COURT:  A second question for you, what

1    services is that Court -- or does that -- the program

2    provide that can't be provided through the VA in any other

3    district?

4            MR. LYONS:  Well, I don't know that it can't be

5    provided at any other district.  I think they have a

6    unique understanding of veterans and their issues, and I

7    think --

8            THE COURT:  Well, so does the Veteran's

9    Administration.

10            MR. LYONS:  Well, they do, Judge.  He has not

11   sought any treatment, and he's finally in a position where

12   he realizes he needs -- he needs some treatment.

13            My goal largely is twofold.  My goal is to get

14   him the treatment that he needs and to also have him

15   reintegrated with his family.  He has family there.  He

16   has a support system there.

17            We're talking about a guy who has high-level

18   skills.  He can do things on computers that very few of us

19   can do, as is reflected by the conduct here.

20            He's been well trained in the military.  He's

21   extremely bright.  So he can -- he can further his

22   education.  He can do the things that are necessary in

23   order for him to become an active citizen.

24            You know, I think the real concerns -- I hear

25   what the Court is saying in terms of what they can provide

1  that we can't provide.  But if he gets a constellation of

2  services, including issues regarding his early childhood

3  life and issues regarding the military and issues

4  regarding substance abuse all in one fell swoop in an

5  atmosphere amongst other veterans, I think that would

6  be -- I think that would be ideal for him and certainly is

7  contemplated by one of the factors in 3553(a).

8         The concern I have, and what's been mulling

9  through my head as I prepared for this hearing, is how do

10 we account for the other factors under 3553(a), and why

11 does my proposal make sense, and why do those factors?

12 And I recognize the seriousness of the offense.  But as I

13 tried to indicate, the seriousness of the offense and the

14 pervasiveness of the conduct really demonstrates the

15 mental health issues that my client has.  I mean, people

16 do not do this on a -- in the nature of a breakup and have

17 this kind of reaction, this kind of overwhelming sort of

18 psychotic reaction, to a breakup.  It's not normal.

19         And he's a 30-some-old man.  He should be able

20 to handle those occurrences with much more -- with much

21 more reasonableness.

22         In terms of deterrence, he's been in jail,

23 Judge, for eight months at this point.  So in terms of

24 specific deterrence, the question is can we make sure he

25 doesn't do this again.

1            I can tell you the massive change that's

2  occurred from the first time I met him to today - I know

3  the Court doesn't have access to that information - but I

4  represent to the Court that his attitude has completely

5  changed.  He's been attending AA meetings in jail.

6            His initial reaction was a bit, you know, I'm

7  not sure how clearly wrong this is.  And as I've come to

8  talk to him about the scope of the offense conduct and the

9  damage that he's probably caused to EG and to her family

10 as well.

11           But this is real stuff.  There's a very real

12 victim here.  Actually, there are multiple real victims

13 here, and that he has to recognize that his behavior has

14 to be constrained so he doesn't cross boundaries that are

15 just absolutely inappropriate, and he has done so here.

16           But in terms of the idea of if he will do this

17 again, I think there's very little chance of that if he

18 gets the proper treatment, because he has the ability to

19 have a successful life.  He has all the tools in place to

20 have a successful life if he gets the necessary treatment

21 that he needs.

22           Eight months in jail is not, as I stand here

23 today, not a particularly long period of time in prison

24 based on the kind of cases that we previously deal with.

25           However, eight months in jail to somebody who's

1  never spent a day in jail is significantly different than

2  eight months or a year in jail to somebody who knows how

3  to do a dime or knows how to do 20 years.

4          So this has had tremendously sobering affect on

5  him.  So although it's considerably less than the

6  guidelines contemplate, I do believe that it has had the

7  necessary salutory affect and would constitute a just

8  punishment in this case.

9          I think my proposal also promotes respect for

10  the law.  You know, we do treat veterans differently.

11  Courts have often taken into account military service and

12  the respect we have for people who serve our country in

13  terms of fashioning a sentence.  And I love the word

14  fashioning because I do think it really does apply to the

15  idiosyncrasies of the particular defendant that's before

16  the Court.

17          THE COURT:  Well, the guidelines specifically, I

18  think, it's 5H1.11, allow the Court to depart for military

19  service, but it has to be of an unusual nature, and I

20  don't believe it really qualifies here, does it?

21          MR. LYONS:  I agree, Your Honor.

22          THE COURT:  So this is more of a 3553 issue than

23  it is a guideline issue.

24          MR. LYONS:  It is, and that's the way I

25  denominated my motion and the reason I denominated it that

24

 1    way.  There's several actual factors that the Court -- the

 2    Court can actually depart for a specific treatment

 3    purpose, but there are conditions that have to be complied

 4    with.

 5            And as I went through the conditions of each one

 6    of those departure provisions, I believe that there might

 7    be, at least legal road blocks, to the application of each

 8    one of those, which is why I have asked for a fairly

 9    substantial variance here under 5C1.1(d), to get him into

10    Zone C of the guideline chart in order for the Court to

11    even allow a split sentence under these circumstances.

12            So, you know, some of those departure provisions

13    get you from a C to a B so you can do it.  But I'm in

14    Zone B, and so I need to get --

15            THE COURT:  Well, the guidelines aren't binding,

16    and so --

17            MR. LYONS:  They're not, Judge, but they're

18    awful important it seems --

19            THE COURT:  Yes, sir.

20            MR. LYONS:  -- most days.

21            THE COURT:  Yes, sir, they are.

22            MR. LYONS:  They are, and I respect that.

23            His family is finally in his life.  He has a

24    support system there.

25            If the Court were to grant the proposal that

25

1  I've made to the Court, he would have access to these

2  services.

3            He's spent time in jail.  He's a convicted

4  felon.  He's going to have to deal with the consequences

5  of being a convicted felon.

6            It's probably beyond my right to say it, but it

7  wouldn't surprise me if the victim at some point would not

8  want him to get the necessary help that he desires.  There

9  is some stuff, material, in the discovery materials.  I

10  have not provided those to the Court, and I don't presume

11  to speak for her.  But I do know that she must understand

12  that he's got some pretty serious issues going on here.

13            Your Honor, for all of those reasons I would ask

14  the Court to grant him a variance, down to level 13.

15            I would ask the Court to impose a 16-month

16  sentence, a split sentence, with eight months of

17  incarceration and eight months of home confinement, either

18  at the New Freedom Farm or at such other place as the

19  Western District of Virginia dictates.

20            He will follow any condition that the Court

21  imposes, and I think he can get the treatment services he

22  needs.

23            With regard to a fine, he's essentially indigent

24  at this point.  I know the Court considers a fine

25  seriously in every particular case.  I would simply ask

 1   that if the Court imposes a fine it gives him some

 2   opportunity to do that on a payment schedule, because he's

 3   having basically to build his life over now from scratch.

 4         I do think a term of supervised release is

 5   appropriate, and I think in conjunction with what I'm

 6   asking the Court to do, that an extensive term of

 7   supervised release may be most appropriate in order to

 8   make sure that we have the necessary monitoring and

 9   deterrence and -- so we can keep track of it and make sure

10   that he's on track to do what he needs to do, so he

11   doesn't have any further brushes with the law.

12         And I thank Your Honor for the time.

13         THE COURT:  I do have one final question,

14   Mr. Lyons.

15         MR. LYONS:  Yes, sir.

16         THE COURT:  And I appreciate the information

17   that you've provided to me.  It's very extensive.

18         Under 5C1.1 in Zone C, that allows the Court to

19   impose a split sentence, at least half of which has to be

20   a term of incarceration.

21         MR. LYONS:  That's my understanding.

22         THE COURT:  But if I determine that eight and

23   eight would not be sufficient, I could still impose a

24   split sentence that would be something more than eight

25   months but would still allow for community confinement;

1  correct?

2          MR. LYONS:  I think that's correct, Your Honor.

3  I think that's correct.

4          And my client even asked me -- pretty sadly, he

5  asked me can the Judge do something in between if he's

6  inclined to do so, and I said he certainly has got the

7  right to do what he thinks is appropriate under the

8  circumstances.

9          THE COURT:  All right.

10          MR. LYONS:  So I think any consideration that

11  the Court would give him based on his history and based on

12  his needs and also recognizing how serious this offense

13  conduct is --

14          THE COURT:  All right.

15          MR. LYONS:  -- would be greatly appreciated.

16          And I think he might want to say something to

17  the Court.

18          THE COURT:  Certainly.  Yes, Mr. Kessler.

19          DEFENDANT KESSLER:  Thank you, Your Honor.

20          I've had eight long months to think about

21  exactly what I did and why I did it.

22          I've got the love and support of my family

23  behind me now.  I did not have that a year ago or 10 years

24  ago even.

25          And basically it all boils down to I did not

1  know how to ask for help.  I knew I needed it.  Other
2  people knew I needed it and saw it in me.  And I'm not
3  exactly proud of the fact that this is what it took for me
4  to actually ask for the help, but now that I'm here, I
5  have really no choice but to accept their help.
6          And in order to get that help I'm going to have
7  to do basically what I've agreed to do, which is anything
8  that this New Freedom Farm or the Veteran's Treatment
9  Court requires of me.  I'm going to be held accountable to
10 that if it's granted.  I know there are a lot of
11 stipulations, and basically if I violate anything, I'm out
12 and immediately back in prison.  And I realize that if I
13 ever do anything like this again, if any of the people
14 represented by the prosecution receive email or message or
15 anything from me, I will be right back here.  I have
16 absolutely no desire to do that.
17         I have basically destroyed the life I had prior
18 to being arrested by my own actions.
19         I have family I need to reconnect with.  I have
20 a career to rebuild.  I have a lot of work ahead of me.
21 This is not over for me by a long shot.  I've got years of
22 work ahead.
23         As for the prosecution and EG and JW and their
24 families, this is over.  It was over in February.  They
25 will never hear anything from me again, unless they choose

 1   to follow me up on their own time.  I have no interest in

 2   following them, finding out what they're doing, where they

 3   are, how their life is going, none of that.  I am

 4   completely out of it.

 5           And just for the benefit of the people in the

 6   courtroom right now and for the record, I just wanted to

 7   state a few things.

 8           I have no plan to ever return to Kentucky unless

 9   I'm required to by the Court obviously.

10           During the course of conduct, there was no -- I

11   had never formulated any kind of plan, never took any

12   actions to actually do anything.

13           Yeah, this is over, and this is never going to

14   happen again regardless of what the sentence is.  This is

15   completely over.

16           Thank you.

17           THE COURT:  All right.  Thank you, Mr. Kessler.

18           Ms. Anderson.  Ms. Anderson, I understand that

19   you have individuals that may wish to make statements to

20   the Court; is that correct?

21           MS. ANDERSON:  That's correct.  Two of the

22   victims have elected to speak to the Court, if Your Honor

23   would --

24           THE COURT:  All right.  Would you like to

25   present those witnesses --

1                MS. ANDERSON:  Yes, sir.  If Your Honor would

2   permit me --

3                THE COURT:  -- I'm sorry, the statements before

4   or after your allocution?

5                MS. ANDERSON:  Before would be great.

6                THE COURT:  Yes, ma'am.

7                MS. ANDERSON:  And if Your Honor would permit,

8   could they speak from the podium?

9                THE COURT:  Yes, that would be fine.

10               MS. ANDERSON:  Okay.  So first speaking would be

11  *SEALED*.

12               THE COURT:  All right.  Thank you.

13               Yes, ma'am, you can come up, please.

14               MS. ANDERSON:  Would Your Honor mind if her dad

15  stood next to her?

16               THE COURT:  That's fine, if you would like to

17  come up.

18               Thank you, ma'am.

19               If you'd like to, you can just -- if you just

20  want to just state your name.  And then if you have a

21  statement that you can either make to the Court or if you

22  can read it, you can read it if you have it in written

23  form.

24               MS. *SEALED*:  Yes, Your Honor.  My name is

25  *SEALED*.  I'm currently in the employment of

1 Spencer Law Group, as I'm also currently working to
2 complete my medical biotechnology degree at the
3 University of Kentucky part time at the moment, which I
4 began this last summer.

5       The defendant and I were engaged in a
6 long-distance relationship that I had decided to, for
7 personal reasons, terminate the first week of May of 2017.
8 It was a decision that I struggled to come to, but
9 ultimately I felt that our relationship would not work and
10 our situations were too different.

11       As it was extremely painful for me to end that
12 relationship at the time, I did know that it would also be
13 very heartbreaking to the defendant.  I, for what it was
14 worth, had tried to extend out a hand of friendship to him
15 at the time and be as supportive as I could in that role
16 if he ever wished to talk to me, or anything else.  I was
17 unsure of how he would feel about that, but I had left
18 that open to him at that time, and I simply desired to end
19 the relationship and for him to honor that wish and
20 recognize that that was a right of mine to do.

21       However, in the many months that followed, it
22 showed that he would not allow that to be the case or
23 honor that decision in any way.

24       For the first several months before I eventually
25 changed my phone number, he sent daily, if not hourly or

1  more often than that, harassing messages to my phone, at
2  first attempting to convince me to come back to him.

3          When I wrote a letter indicating that that would
4  not be the case and attempting to explain the reasons why
5  for that, those messages instead turned simply downright
6  ugly and showing that rage.

7          After a short time at that point, I decided that
8  it was for the best to stop responding in any way, that
9  nothing I said was going to be of any use or any help,
10 that I could not help him as I thought I could at the
11 beginning, that it would be better for me to step away
12 from the picture completely.

13         However, even with zero responses, he continued
14 to send those messages to me, tried to call me
15 continuously, and when I continued not to respond in the
16 hopes that that would eventually stop, then he began to
17 try to use other methods to get me to talk to him.

18         First, he started trying to convince me that he
19 was going to commit suicide via messages and also going as
20 far as to send photos, for example, of going out into the
21 desert at night to try to convince me to that affect.

22         And he knows that I'm a very sympathetic
23 individual.  I believe he used that to get me to contact
24 him out of fear, knowing that I would end that silence
25 and, you know, try to prevent that from happening, because

1  I wasn't sure at that point.  I wasn't sure of -- I was

2  beginning to think like if the man I thought I knew was --

3  had changed that much or if I had ever known him to begin

4  with fully at all.  So I wasn't sure.  I wasn't sure what

5  he was going to do.  I was fearful of that.

6          So, of course, I reached out to him after the

7  suicide threats to -- and also including people that we

8  both knew online so that he can maybe hear from someone

9  else so that, you know, together if that was actually

10 going to be a possibility that we could stop that from

11 happening.

12          But it turns out that, you know, he did not plan

13 on that.  So -- and that he had actually used the other

14 people around me just to get to me and the people that I

15 was trying to talk to to reach out to him and try to help

16 him in my defense.

17          A second form of blackmail that he attempted to

18 use to get me to contact him due to my silence in not

19 responding to him was to threaten to release revealing

20 photos that he had taken without my permission.  I again,

21 of course, reached out in fear of that, of via email

22 telling him that I would take action if he were to follow

23 up on those threats.

24          The continued response was made without taking

25 any consideration to that, saying that he essentially

1   didn't care about that.  So basically I was left to fear

2   every day would be the day that he would snap and actually

3   do something, either, you know, commit suicide, release

4   the photos of me.

5            I did searches on myself at one point on a daily

6   basis in case I was to actually come across those photos

7   online wondering how many people would be able to see that

8   before I came across them.  It was a very, very harrowing

9   feeling.

10           But -- and it also affected my workplace pretty

11  tremendously.  As -- you know, I had all these fears going

12  to work every day, but -- so I could not focus on my work

13  as I normally do.  I -- my work was tremendously impaired

14  in my ability to function there.  But I'm sure in any

15  other job I would have been terminated except for my boss

16  was very understanding, as well as also being a friend to

17  me.  So he worked with me through that time even though I

18  was not keeping up with my normal workload.

19           But that would happen for several months, and I

20  would often have to take breaks to search through the new

21  messages and figure out what exactly he was doing then and

22  how I was going to respond or react to that.

23           It reached the point that I changed my phone

24  number and began to cutoff every point of contact I could

25  possibly find that he would -- that he might and also did

1   use to get to me.  A lot of this was obviously online.  We

2   had met each other over a video game and through the

3   online world.

4           And while I was not quite as active as I had

5   been in the past in this, I still had several friends

6   online and people I talked to and some activity there as

7   well.

8           And as soon as I cutoff all of those points of

9   contact and even changing accounts, voiding accounts,

10  deleting my Facebook, of course, as I said I changed my

11  phone number and basically disabling the ability for him

12  to get to me, he instead branched out to begin to harass

13  my family and those that he thought were around me.  These

14  included people that I did talk to often.  They also

15  included people that I had never talked to before, anyone

16  that was, I guess, thought to be in contact with me.

17          I heard from my father that, you know, he began

18  contacting him through phone calls, through messages,

19  about me to get to me, and I believe also with the idea of

20  affecting my family and my relationship.  And I will leave

21  that more for my father to go into.

22          But I began to get messages from these -- the

23  online friends and the people that I had been around

24  before that they were showing me screenshots and multiple

25  things that he had sent to them that were very -- of --

1  the defendant finding their personal information and then

2  sharing that online.  By which means I'm not sure, you

3  know, how he found out that personal information, but he

4  was posting it to them and essentially with the idea to

5  scare those around me, which he very well succeeded in

6  that.

7          And I found that despite being told multiple

8  times by multiple people that my only desire at that time

9  was to be left alone, but that right was not afforded to

10 me.

11         It continued to worsen despite him having no

12 direct contact to me except for email.  I did not block

13 the email.  I figured it was a controlled way to receive

14 any messages so that I could essentially keep an eye on

15 what he was doing, to try to gauge the mindset or what was

16 going on at that time as he continued to send those emails

17 through this February, and which continued to be very

18 harassing, very -- and very just mean and nasty to me

19 despite the fact that I had not contacted him in months.

20 And that was the only method I had left open at that time;

21 although, I never responded once to that.

22         And it continued to worsen until he began to

23 threaten to see me and began to send messages attempting

24 to convince me that he was there, knowing of the habits

25 such as how my father and I often had, you know, would go

1  to dinner and movie as family time together and trying to

2  ask me how the movie was or different messages to that

3  affect in order to try to scare me to think that he was

4  coming for me.

5          Eventually it got continued towards the point

6  shortly before February where he eventually threatened my

7  life, and that I would -- I would pay for what I did and

8  that no one would be able to help me.

9          And then again it's just -- I wasn't -- I was

10 never sure during any of these months of what he would or

11 wouldn't do because this behavior was -- was not something

12 I had -- I had seen.

13         So again I was left wondering that if he had

14 changed, or again, if I had ever known him properly at all

15 during our time together.

16         That's all I wish to say, Your Honor.

17         THE COURT:  All right.  Thank you, ma'am.

18         MS. ANDERSON:  Your Honor, Mr. *SEALED* would

19 like to address the Court as well.

20         THE COURT:  Yes, sir.

21         MR. *SEALED*:  My name is *SEALED* *SEALED*, and

22 I am *SEALED* father.

23         THE COURT:  Yes, sir.

24         MR. *SEALED*:  You know, I'm here today as a --

25 sorry.

```
 1              THE COURT:  Yes, sir.

 2              MR. *SEALED*:  I'm here today as a father and as

 3   a husband.  I won't go into a whole lot of detail about,

 4   you know, *SEALED* experiences because she's just done

 5   that, but I will tell you the father's perspective.

 6              There were many times when I had to hold her

 7   crying, you know, asking me why is this happening and me

 8   having to say I don't know why it's happening.  I don't

 9   know -- I don't know why this is happening but trying to

10   assure her, don't worry, Honey, it's going to be okay but

11   deep inside not really being sure that that was the case,

12   right.

13              I mean, I think we all sort of suspected, or at

14   least wanted to believe, that it was just bluster, that it

15   was just an angry, young man trying to lash out.  But the

16   longer it went on, the less it seemed like that might be

17   the case.

18              You know, you can't pick up a newspaper nowadays

19   without reading an article about somebody that went off

20   the deep end and took as many people with them as they

21   could.  So we had to take it seriously.  We had to.  I

22   mean, it would be irresponsible to do anything else.  So

23   we took it seriously.  I held her when she needed to be

24   held.

25              But I do want to point out that she wasn't the
```

1   only victim.  You know, I've since been remarried.  My

2   current wife has in many ways, I think, been like a second

3   mother to my daughter.  They are very, very close.

4          And during the period of time that my daughter

5   was dating Mr. Kessler, she lived with me.  And even

6   though she didn't anymore for the bulk of the time

7   involved, he didn't know that.  And so we knew that if he

8   ever made good on his threats, the only address he had was

9   our address.  This had a devastating affect on my wife,

10  and I'll just tell one story to kind of drive this home.

11         It was last November.  I was signed up to be --

12  I was on a team for a three-day men's retreat at the

13  church I go to, and I was going to leave on Thursday and

14  come back on Sunday.

15         And earlier in that week I received a message

16  from Mr. Kessler, something to the affect of, you know,

17  you know, the time -- you know, the waiting is over, the

18  time for action is now, or something like that.  I don't

19  remember exactly.

20         And we talked about it.  I talked about it with

21  my wife and decided, you know, I need to go through this

22  retreat.  We've been planning it for six months.

23         So I went ahead and drove to the retreat center,

24  which is about an hour-and-a-half from our house.  My wife

25  was to be alone for those three days.

1          I stayed over Thursday night, and on Friday
2   morning I was at the retreat center, and I got a phone
3   call from my daughter.  She had just received another
4   threatening message from Jesse indicating that something
5   was going to happen.

6          And I remember in that retreat center looking at
7   my phone and thinking, okay, what do I do?  Do I call
8   *SEALED*, my wife, and tell her, or do I just assume that
9   this is more bluster and not do anything, you know?  But I
10  knew I couldn't hide it because we had to take these
11  things seriously.

12         So I called her, and I told her about the
13  message, and it scared the crap out of her.  And she told
14  me crying on the phone that day that she could not go back
15  to our house by herself.

16         She was at work, and I told her, you know, we'll
17  do what we have to do.  When you get off work, you go to a
18  friend's house, and you stay there.

19         As soon as I finish my duties at the retreat
20  today, I'll drive home.  I'll go to the house.  I'll check
21  it out to make sure everything is okay, and then I'll call
22  you.  You come, I'll spend the night with you.

23         So for three days I drove back and forth, an
24  hour-and-a-half each way, so that I could stay with my
25  wife so that she would not have to be in our house alone

1   for those three days.

2            And that was a milestone event for us because

3   that was the time.  After that retreat was over, we

4   talked, and we said, this is crazy.  We've got to do

5   something.

6            And so I installed an alarm system in the house,

7   and I went out and bought guns, and we learned how to use

8   those guns.  My wife has a concealed carry license now.

9            And we took -- I'm 55 years old, or at that time

10  I was 55 years old, and in 55 years I had never felt the

11  need to have an alarm system or a gun to feel safe in my

12  own home.  But these events have forever changed what it

13  means to me to feel safe in my own home and for my

14  daughter to feel safe.

15           That's all, Your Honor.

16           THE COURT:  Thank you.

17           Ms. Anderson.

18           MS. ANDERSON:  Thank you, Your Honor.

19           As I was reading through the defendant's

20  submissions for sentencing today, it was evident that he

21  felt some remorse, and the program presented seemed like

22  a -- something that could be helpful for him.

23           But immediately I'm reminded as I am reading

24  back through my own sentencing memorandum of the pervasive

25  nature of the offense in this case, something that I can't

1   quite convey like the victims could.

2          So I'm glad you had an opportunity to hear from

3   them like I have heard from Ms. *SEALED* throughout this

4   investigation.

5          I think one of the things that stuck out with me

6   in this case is the ability to eliminate the comfort of

7   distance between -- the physical distance between

8   Ms. *SEALED* here in Kentucky and the defendant in

9   California.  He was able to erase that distance through

10  the mechanism of online and other electronic

11  communications.

12         So more than that -- more than eliminating the

13  distance, he made himself an ever present part of her

14  life, finding her on her phone, her email, on these online

15  games, through friends, communications with friends via

16  different mechanisms used are plentiful.  I think you

17  heard about them today.

18         And so what you saw in the last 20 minutes is a

19  new age of victimization here and a new type of victim,

20  somebody who doesn't have to see the person or see a knife

21  or see a gun to feel the kind of fear that these

22  individuals felt.  And these are only two.

23         Of course, *SEALED*, who we spoke about, and

24  Ms. *SEALED* other boyfriend, also received some of these

25  communications, but they said it best.  So I think the

1   seriousness of the offense has been set forth.

2           As far as a sentence goes, this sort of crime

3   has to be met with a just punishment that not only deters

4   the specific individual but sends a signal or at least

5   deters other individuals from committing similar acts,

6   which is so easy to do from behind a computer or on a

7   phone.

8           Mr. Kessler's remorse is commendable, and a

9   program to help suffering veterans sounds like a great

10  idea, but that sounds like something that should be

11  handled at the period of supervised release that comes at

12  the end of a period of incarceration.

13          There are multiple purposes for punishment, and

14  I understand Your Honor knows that better than most

15  judges.  But the one that seems to be forgotten in the

16  defendant's submissions is the punishment for the crime

17  that has happened and for the affect that that has had on

18  these victims.

19          He certainly needs to be rehabilitated.  He

20  certainly needs some help with the alcoholism and the

21  ability to handle life's messes, but those things can be

22  accomplished within the Bureau of Prisons and perhaps also

23  at the Veteran's Court of this -- the farm they were

24  talking about in Virginia at the period of supervised

25  release.  And it sounds like Virginia is willing to accept

44

1    him as a supervised release -- accept his supervised

2    release in their jurisdiction.

3            So what the defense has proposed seems to fit

4    nicely on the tail end of what should be a just and long

5    punishment.

6            The United States's sentencing recommendation at

7    a high end of the guidelines range fully support that, as

8    I stand here today, especially given the testimony we

9    heard.

10           So for those reasons I think a split sentence is

11   inappropriate here, and we ask for the full 30 months.

12           Thank you, Your Honor.

13           THE COURT:  All right.  Thank you.

14           Mr. Lyons, any additional comments or response?

15   I didn't give you the opportunity to respond to the

16   victims' statement, but I'll do that now.

17           MR. LYONS:  I have no response to the victims,

18   Judge.  You heard them, and you'll make a proper

19   assessment of those individuals.

20           THE COURT:  All right.  Thank you.

21           Well, there are a number of factors that the

22   Court must consider when it imposes an appropriate

23   sentence.  I do begin from the guideline range, the

24   properly calculated guideline range, but I also consider

25   all of the statutory factors outlined in Title 18,

1  Section 3553.

2          I've looked through all the materials that have

3  been submitted, and I do appreciate those materials.  It

4  does appear that there are some unique programs that are

5  being developed for veterans, and also I've reviewed the

6  materials on Fritz Farm, and they're very impressive.

7          Looking at the factors of 3553, those factors

8  would not support the split sentence that has been

9  requested, but what I have determined to do in this

10  particular case is I am going to impose a sentence within

11  the guidelines, but I'm also going to require as a

12  condition of supervised release community confinement, and

13  that will allow participation in this particular program

14  at the end of the sentence.

15          Now, in determining the length of the sentence

16  as I look through the factors of 3553, what I have

17  determined to do -- and I'm announcing this on the front

18  end and then providing the explanation here in just a

19  moment.

20          The United States has made a recommendation of a

21  sentence at the very top of the guidelines based upon the

22  seriousness, but there are some mitigating factors in this

23  particular matter that have been outlined, both in the

24  written materials and also orally by counsel that cause me

25  to impose, in terms of the term of incarceration, a

1    sentence at the bottom of the guideline range, which

2    would be 24 months.

3            But then I'm also going to require six months of

4    community confinement at the beginning of supervision.

5    That will effectively create a sentence that I believe

6    will allow the defendant to participate in this program,

7    and hopefully he will be able to be enrolled in the

8    program that will provide him with certain services.  But

9    it would be at the beginning of his supervision.

10            So I'm going to impose a term of three years

11    supervision, and the first six months will be community

12    confinement.

13            The defendant has, of course, already served

14    approximately eight months of the sentence that will be

15    announced, and he will be given credit for that.  So he'll

16    have additional time to serve.

17            It is my belief that such a sentence that I've

18    indicated will take into account all of the factors of

19    3553, particularly the nature and circumstances of the

20    offense.

21            This Court is seeing more of these cases.  There

22    aren't that many of these cases that have been filed over

23    the last 10 years.  Perhaps I'm getting more than my fair

24    share, I don't know, but I've had several just in the past

25    few months.

1          Sometimes I think things get out of control

2    quickly, and that appears to be what happened in this

3    particular case.  And it can happen with individuals that

4    don't have significant criminal histories, and it can

5    happen with individuals that do have military background.

6    So hopefully the VA will be able to provide some services

7    for the defendant, as well as the services that will be

8    provided through these other programs.

9          But I must take into account the nature and the

10    circumstances of the offense, and I certainly do consider

11    the statements that have been made by the victims in the

12    case.

13          I also consider the defendant's history and

14    characteristics, which are for the most part positive

15    characteristics.  He's an intelligent man obviously.  He

16    has the ability certainly to work and support himself and

17    overcome these problems.

18          And I do believe that he's being forthright and

19    honest to the Court when he says he's not going to have

20    any further contact with the individuals that have been

21    identified in this particular case.  I take him at his

22    word on that, believe that these individuals can put this

23    past them, as well as hopefully the defendant when he

24    finishes this term of incarceration.

25          But as everyone acknowledges, it is -- it is a

1  serious offense.

2         The sentence that I have indicated I'll impose,

3  I believe, will promote respect for the law, and it would

4  be a proper and a just punishment.

5         As Ms. Anderson properly points out, there are

6  essentially three areas of sentencing that we consider.

7  We do take into account issues of rehabilitation.  They're

8  very important because if we do that properly, then that

9  also provides protection of the public, and it also

10  provides a deterrence, which is really the second -- what

11  I consider to be the second part of the second leg of the

12  three-legged stool of sentencing.

13         The other that's sometimes ignored is punishment

14  for the offense.  Sometimes we get so caught up in

15  attempting to provide Social Services to individuals that

16  we forget that when a person commits an offense, a federal

17  offense, that there is a punishment that should be

18  imposed.

19         I believe that the sentence that I've announced

20  will also provide deterrence, and there are two types of

21  deterrence.  There is specific deterrence for the person

22  that's appearing before the Court, but there's also

23  general deterrence for others that might be inclined to

24  commit a similar offense.  And my concern is that the

25  split sentence that has been recommended would be

1  insufficient to provide general deterrence, and it would

2  unduly depreciate the seriousness of this particular

3  offense.

4        I do believe that with proper treatment through

5  the Bureau of Prisons and also through services provided

6  by probation and these programs that have been mentioned

7  will provide sufficient protection of the public and that

8  the defendant will not reoffend.  I'm very hopeful that

9  this defendant will not reoffend, but I do believe that

10 some services are appropriate here, both in terms of

11 alcohol abuse and some counseling.  Some mental health

12 counseling I do believe would be beneficial for the

13 defendant.

14        I don't know about the issues of PTSD.  They're

15 thrown about quite often, but I think there should be a

16 proper evaluation and diagnosis for those conditions and

17 treatment if it is -- if it certainly is warranted.

18        Typically I will tell you that with this

19 particular offense and based upon the information that has

20 been provided, typically I would be looking more toward

21 the upper end of the guidelines and then adding an

22 additional six months of community service as a term of

23 supervision, but I believe that based upon the defendant's

24 work history, his ability to support himself, and

25 hopefully his family going forward, as well as his

1   military record, exemplary military record, and again his

2   lack of criminal history, are mitigating factors that do

3   cause me to go down to the bottom of the guideline range

4   in determining the term of incarceration.

5           When I look at the other factors, including the

6   need to avoid unwarranted sentencing disparities among

7   defendants with similar records who have been found guilty

8   of similar conduct, I believe that that particular section

9   of 3553 would be met by the -- by the term that has

10  been -- that has been announced.

11          Again, I do certainly appreciate all of the

12  information that has been provided on the various

13  programs.  It's information I do intend to follow, and I

14  want to follow this particular Court and the program and

15  see how it develops and see if it's something that might

16  be appropriate, either for this district or perhaps

17  recommending for other districts.

18          But as we all know, sentencing is individual,

19  and in this particular case the sentence that I will

20  announce is based upon all the information that has been

21  provided to me today and also through the materials that

22  have been provided, not only by the defendant but also by

23  the United States in its arguments that have been

24  presented here and in the written materials.

25          So I'll announce the sentence.

 1          And it will the sentence of the Court, pursuant

 2  to the Sentencing Reform Act of 1984, as modified by the

 3  decisions in Booker and Fanfan, and I do believe that the

 4  following sentence would be sufficient, but it would not

 5  be greater than necessary to meet all of the purposes of

 6  Title 18, Section 3553(a).

 7          And, therefore, it will be the judgment of the

 8  Court that the defendant, Jesse Kessler, will be committed

 9  to the custody of the Bureau of Prisons for a term

10  of 24 months.  And, again, he will receive credit for the

11  time that he has spent in custody to this point.

12          It will be recommended to the Bureau of Prisons

13  that during the remaining term of incarceration that he

14  participate in a mental health treatment program and

15  receive any necessary treatment and counseling services

16  during that time period.

17          Likewise, I will recommend that he receive

18  treatment for substance abuse during the remaining period

19  of incarceration; specifically, focusing on alcohol abuse.

20          Upon release, he will be placed upon supervision

21  for three years.

22          And within 72 hours of release from the custody

23  of the Bureau of Prisons, he must report in person to the

24  probation office in the district in which he is released.

25          For six months of the term of supervision would

1  be a term of community confinement, and I would recommend

2  that he participate in the programs that have been

3  announced and have been recommended by the defendant,

4  including the Veteran's program that's offered through the

5  Western District of Virginia.

6           While on supervised release, he may not commit

7  another federal, state, or local crime.

8           He must also comply with the mandatory and the

9  standard conditions that will be set out in the judgment

10 and the commitment order and that have been adopted by the

11 Court.

12          I'll also impose additional conditions, which

13 will include some that are standard, but they are that he

14 not possess a firearm, destructive device, ammunition, or

15 a dangerous weapon.

16          And he must refrain from any unlawful use of a

17 controlled substance and submit to one drug test within

18 15 days of release and at least two periodic drug tests

19 thereafter.

20          For special conditions they would include that

21 Mr. Kessler abstain from the use of alcohol, that he not

22 purchase, possess, use, distribute, or administer any

23 controlled substance or paraphernalia relating to

24 controlled substances except as prescribed by a physician.

25          And he must not frequent places where controlled

1  substances are illegally sold, used, distributed, or

2  administered.

3        He must also attend and successfully complete

4  any mental health diagnostic evaluations and treatment or

5  counseling programs as directed by the probation office.

6        He'll be responsible for paying the cost of any

7  treatment services provided, but if he's unable to pay the

8  cost of those services during any month in which they are

9  provided, he would be required to perform 10 hours of

10 community service during the following month, and the

11 nature of that community service would be determined by

12 the probation office.

13       He must refrain from obstructing or attempting

14 to obstruct or tamper in any fashion with the efficiency

15 and accuracy of any prohibited substance testing, which is

16 required as a condition of release.

17       He must also consent to the probation office

18 conducting unannounced examinations of his computer

19 system, and any internal or external storage devices,

20 which may include the retrieval and copying of all memory

21 and hardware or software and -- or the removal of such

22 systems for the purpose of conducting more thorough

23 inspection.

24       And he must consent to having installed on his

25 computer any hardware or software that's necessary to

1   monitor his computer usage or to prevent access to

2   particular materials.

3           And he must consent to periodic inspection of

4   the installed hardware and software to ensure that it's

5   functioning properly.

6           If he has access to online computer service at

7   his place of employment, and those same limitations would

8   also be applied to his computer usage at that location.

9           And he must provide the probation office with

10  accurate information about his entire computer system,

11  including any hardware or software and any internal or

12  external storage devices and all passwords used by him.

13          And he must abide by the rules of the Computer

14  Restriction Monitoring Program adopted in the district.

15          And he may not have any contact with any

16  identified victims in the case.

17          In light of the penalty that has been announced,

18  the sentence that has been announced, I am going to waive

19  the fine requirement in this particular case.  I do

20  believe that it would inhibit or prevent the defendant

21  from being able to become successfully employed and then

22  proceed without violations.  And, therefore, I'm going to

23  waive the fine requirement.

24          But he will be required to pay the special

25  assessment of $100.  That will be due immediately.

1           But for the reasons stated and considering the

2    factors of 35 -- excuse me, of chapter 5F of the

3    sentencing guidelines, I will waive the fine requirement

4    in this particular case.

5           Would you like for me to recommend placement,

6    Mr. Lyons?

7           MR. LYONS:  May I have just a second with my

8    client?

9           THE COURT:  Yes, sir, certainly.

10          MR. LYONS:  Your Honor please, my client

11   indicates that he would request the Court to recommend a

12   place in Pennsylvania.  That's where his mother is and his

13   stepfather --

14          THE COURT:  All right.

15          MR. LYONS:  -- and I think some extended family.

16   So if the Court would ask them to do that.

17          THE COURT:  Is there a specific location in

18   Pennsylvania?  Is it Allentown?

19          DEFENDANT KESSLER:  Allentown.

20          THE COURT:  Allentown, all right.  I'll include

21   a recommendation to the location closest to Allentown for

22   which he would qualify, but I do want you to be able to

23   get those services.  So the services would be the first

24   recommendation, the location would be second, but it would

25   be -- I'll designate that location.  Hopefully it will be

```
 1  as close to Allentown as possible.

 2              MR. LYONS:  Thank you, Your Honor.

 3              THE COURT:  All right.  In -- let's see, in just

 4  a moment, I will ask the clerk to advise Mr. Kessler of

 5  his appellate rights.  I do want to check the plea

 6  agreement quickly.  I believe he reserved the right to

 7  appeal the sentence in this case.

 8              MR. LYONS:  He did, Your Honor.

 9              THE COURT:  So I'll have the clerk advise him of

10  those appellate rights here in just a moment.

11              But before I do that I'll entertain any

12  objections that the parties may have; first, to the

13  sentence that has been announced, including all of the

14  conditions of supervision; second, if there are any

15  objections under United States versus Bostic, you may

16  state those at this time.

17              Of course, under Bostic any objections not

18  previously stated would need to be identified at this time

19  so that they may be addressed by the Court to be properly

20  preserved for review on appeal.

21              And finally, if the parties would like the Court

22  to make additional findings to support the sentence, I'll

23  certainly do so upon request.

24              Also, Ms. Anderson, I did not see in the record

25  any request for any victim restitution.  I assume there's
```

1  none in this particular case, but I want to make sure

2  that's clear on the record.

3          MS. ANDERSON:  Yes, Your Honor, there is no

4  victim restitution.

5          THE COURT:  All right.

6          MS. ANDERSON:  And the United States does not

7  seek any additional findings or have an objection to the

8  sentence.

9          THE COURT:  All right.  Thank you.

10         Mr. Lyons.

11         MR. LYONS:  Your Honor, I have no objections

12  under Bostic.  I believe the Court has addressed the

13  issues that we have presented.

14         I do have one question with respect to the

15  computer restrictions.

16         THE COURT:  Yes, sir.

17         MR. LYONS:  Not so much at his home because that

18  seems entirely appropriate.  A restriction that's similar

19  to that as it applies to employment, I just ask the Court

20  to give that some consideration for a second.  I don't

21  know how much that would tamper his ability to actually

22  get a job having to inform the employer that his computer

23  at the job is going to be monitored.  I wonder whether or

24  not that might be a bit counter-productive.  I understand

25  the Court is trying to make sure he doesn't have access.

1          THE COURT:  I actually reduced the restriction

2   somewhat.  Typically the condition that would include

3   would prevent him from possessing or using any device with

4   any online computer service at any location.  So what I've

5   done is I've modified by taking that particular condition

6   out.

7          And in the event the defendant does seek

8   employment from a particular company, entity, that that

9   would present a problem, he can seek to have the Court

10  modify that at an appropriate time, and at that point I

11  can look at the particular type of business or industry

12  and make a determination as to whether it would be

13  appropriate to include -- to remove that or to keep that

14  restriction in place.  And so --

15          MR. LYONS:  That's where I --

16          THE COURT:  -- that would be my preference.

17          MR. LYONS:  -- was headed.  That's where I was

18  headed, Your Honor, without -- is if that could be

19  considered at a point where he might have a job

20  opportunity or something along those lines.

21          THE COURT:  Yes, sir.  And hopefully I'll be

22  able to take a look at that at the appropriate time.  And

23  if a modification is appropriate, then I'd be in a better

24  position at that time to consider that than I would be at

25  this point, not knowing what position he might be -- he

1    might be seeking.

2                    MR. LYONS:  Makes perfect sense.

3                    Your Honor, also I have no further objections,

4    other than the objections that the Court has already

5    overruled on the record.

6                    THE COURT:  All right.  Those, of course, are

7    retained and are reflected as objections.

8                    All right.  Thank you.

9                    Madam Clerk, if you would please advise

10   Mr. Kessler of his appellate rights.

11                   THE CLERK:  Yes, Your Honor.

12                   You are notified by this Court that you have a

13   right to appeal your case to the Sixth Circuit Court of

14   Appeals, which on proper appeal will review this case and

15   determine that there has or has not been an error of law.

16                   A defendant may waive those rights as part of a

17   plea agreement, and you have entered into a plea agreement

18   which waives some or all of your rights to appeal the

19   conviction.

20                   Such waivers are generally enforceable, but if

21   you believe the waiver is unenforceable, you can present

22   that theory to the appellate court.

23                   If you're unable to pay for the cost of the

24   appeal, you have a right to apply for leave to appeal in

25   forma pauperis, which means you may appeal without paying

1   for it.

2            If you are without the services of an attorney

3   and desire to appeal, upon request the clerk of this Court

4   shall prepare and file forthwith a notice of appeal on

5   your behalf.

6            With few exceptions this notice of appeal must

7   be filed within 14 days from the date of entry of this

8   judgment.

9            If you do not have sufficient funds to employ an

10  attorney, the Court of Appeals may appoint your present

11  attorney, or another, to prosecute the appeal for you.

12           You may request to be released on a reasonable

13  bond pending appeal.

14           THE COURT:  Thank you.

15           Mr. Kessler, you're about to be handed what was

16  just read.  If you could please take a moment to review

17  your appellate rights with counsel, and after you've

18  assured yourself you understand those rights, if you could

19  sign that original document.  And there's a copy that you

20  can keep for your records.

21       (Whereupon, Defendant Kessler signs the form.)

22           THE COURT:  All right.  Thank you.

23           Are there any other issues we need to take up in

24  the case at this time?

25           Ms. Anderson.

```
 1              MS. ANDERSON:  I have a quick question.

 2              THE COURT:  Yes, ma'am.

 3              MS. ANDERSON:  The victims that have spoken

 4   today and revealed their names and used a little bit in

 5   the sentencing hearing today, is there a mechanism by

 6   which I can get those either redacted from the record, or

 7   should I move so and --

 8              THE COURT:  I'll consider the oral motion to

 9   seal portions of the transcript that do refer to the

10   identified victims by name.

11              MS. ANDERSON:  Yes, sir.

12              THE COURT:  And we will just seal those pages of

13   the transcript if they are subsequently filed.

14              MS. ANDERSON:  Great.  Thank you, Your Honor.

15              THE COURT:  All right.  Any objection to that

16   procedure?

17              MR. LYONS:  No, sir.

18              THE COURT:  All right.  Of course, they're

19   available if they're needed for appellate reasons, but

20   they would be -- would be in the file under seal.

21              All right.  Thank you.

22              I believe our next hearing is at 11 o'clock.

23              Mr. Lyons, you were appointed pursuant to the

24   Criminal Justice Act to represent Mr. Kessler.

25              MR. LYONS:  I was, Your Honor.
```

1          THE COURT:  I'm sure he appreciates your

2  representation of him in this matter, and the Court

3  appreciates your willingness to continue to take these

4  matters.

5          MR. LYONS:  Yes, sir.

6          THE COURT:  We will be in recess until

7  11:00 a.m.

8      (Whereupon, the Sentencing Hearing proceedings

9  concluded at 10:25 a.m.)

10              C E R T I F I C A T E

11     I, Peggy W. Weber, certify that the foregoing is a

12  correct transcript from the record of proceedings in the

13  above-entitled matter.

14

15

16  June 22, 2020            s/Peggy W. Weber
        DATE                 PEGGY W. WEBER, RPR

17

18

19

20

21

22

23

24

25